IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2022 Session

FILED
05/12/2022
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. JAMES THEODORE MENARD, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 114867    Steven W. Sword, Judge**

---

### No. E2021-00164-CCA-R3-CD

---

The Defendant, James Theodore Menard, alias, was convicted by a jury of rape of a child, exhibition of pictures depicting sexual conduct harmful to a minor, and two distinct counts of aggravated sexual battery, for which he received an effective forty-two-year sentence. On appeal, the Defendant argues that (1) the trial court committed plain error by allowing references to the victim's forensic interview, as well as permitting remarks that the victim made allegations against the Defendant while at school; (2) the trial court committed reversible error by letting the State make improper comments during closing argument; and (3) the cumulative effect of these errors deprived him of a fair trial. Following our review, we affirm. However, we must remand for a clerical error in the judgment form for Count 3.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court
Affirmed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Eric M. Lutton, District Public Defender; and Jonathan P. Harwell (on motion for new trial and on appeal), David Gall (at trial), and Jessica M. Greene (at trial), Assistant District Public Defenders, for the appellant, James Theodore Menard, alias.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Charme P. Allen, District Attorney General; and Nathaniel Ogle and Sarah W. Keith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

The cases arises out of allegations that the Defendant sexually abused his girlfriend's daughter, R.H.[1] ("the victim"), between December 12, 2016, and January 24, 2018, when the victim, at all times, was under thirteen years of age. Thereafter, on February 12, 2019, the Defendant was charged by presentment with the following offenses: count one, rape of a child; count two, aggravated sexual battery (by the Defendant's touching the victim's intimate parts); count three, aggravated sexual battery (by the victim's touching the Defendant's intimate parts); and count four, exhibition of pictures depicting sexual conduct harmful to a minor. See Tenn. Code Ann. §§ 39-13-504, -13-522, -17-911. Co-defendant K.H., the victim's mother, was charged in count five with failure to report child sexual abuse; her case was later severed from the Defendant's. The Defendant's case proceeded to a jury trial on November 18 and 19, 2019.

At trial, K.H. stated that she and the Defendant had been "best friends" for twenty-three years. She confirmed that she had been involved in a romantic relationship with the Defendant and that she and the victim lived with the Defendant in a Montgomery Village apartment on Daylily Drive from 2016 to the beginning of 2019. K.H. testified that she left the victim alone in the apartment with the Defendant sometimes when she would go do laundry or go grocery shopping.

According to K.H., after she and the Defendant moved in together, they would "argue a lot" and "get physical and fight" when they were using drugs, which was more frequent than not. K.H. testified that the Defendant struck her with his hands from time to time and that on one occasion, he threw K.H.'s phone at her, and it hit her in the face. K.H. indicated that the victim often observed these fights and that in response to the fighting, the victim would run to her bedroom.

K.H. confirmed that she was interviewed by Investigator Jonathan Harris and that during the interview, she offered a reason as to why the victim might know more about sex than was appropriate for the victim's age. According to K.H., the victim overheard the Defendant and K.H. discussing how the Defendant's daughter was sexually abused by her mother's boyfriends in Colorado. K.H. explained that she would read to the Defendant the paperwork from that case that was sent to the Defendant. However, K.H. acknowledged that the details of the sexual abuse that the Defendant's daughter endured were different from the details of the abuse that the victim reported.

On cross-examination, defense counsel asked K.H. about the economic circumstances of their household. K.H. agreed that they were "poverty stricken,"

---

[1] To protect the minor victim's identity, we will refer to the victim and her mother by their initials.

subsisting on food stamps and doing community service work to pay for rent and utilities; however, the victim had a bed to sleep on and enough clothes to wear. Defense counsel explained that he was asking because "in some of the notes from" the Department of Children's Services ("DCS"), they mentioned that the victim was sleeping on blankets. K.H. said that such information was inaccurate, though it may have appeared that way when DCS came to the apartment because K.H. had just cleaned the victim's bedroom and the victim's mattress was up against the wall so the floor could dry.

K.H. believed that the Defendant's daughter was around fourteen at the time she made the sexual allegations against her mother's boyfriends. K.H. explained that she read information about the Colorado situation to the Defendant, who was functionally illiterate, multiple times over a period of several months from the end of 2016 through the beginning of 2017. K.H. also indicated that during this timeframe, the victim and the Defendant's daughter may have spoken briefly once or twice over the phone and that she and the Defendant discussed trying to obtain custody of the Defendant's daughter, though that never came to pass. According to K.H., the victim was both excited and jealous about the prospect of the Defendant's daughter coming to live with them.

K.H. was asked about the victim's friends in the neighborhood. K.H. said that the victim played with "a whole group of kids" who lived in the neighborhood, and K.H. listed several of them by name. K.H. testified that she had heard rumors that "bad things," which included allegations of sexual abuse, might have happened to some of the victim's friends, and K.H. believed that this was something the victim and her friends would have discussed. K.H. said that Montgomery Village was a dangerous neighborhood and that consequently, it was often not safe for the victim to play outside, which angered the victim and necessitated a punishment. K.H. affirmed that the victim was punished by being confined to her room and that from time to time, the victim was physically punished as well. Relative to the length of time the victim was confined to her room, K.H. admitted that it was "longer than it should have been" at times.

Regarding the fights that took place between K.H. and the Defendant, K.H. acknowledged that she sometimes instigated those fights and that she had in fact been arrested once for assaulting the Defendant. She was ultimately convicted and placed on probation. The Defendant had never been charged with domestic violence against K.H.

K.H. confirmed that she and the victim lived in Michigan prior to moving to Knoxville and that once in Knoxville, it was customary for the victim to stay with her grandparents in Michigan during the summers. K.H. acknowledged that while they were living in Michigan, she took the victim, who was about five years old at the time, to the hospital based upon an allegation of sexual abuse that did not involve the Defendant. Though the victim was questioned by a Michigan agency "similar to Childhelp in Tennessee," nothing came of those allegations.

R.H. confirmed that her birthday was in December and that she was presently nine years old and lived in Michigan with her grandparents. She recalled a previous time when she was younger and lived in a Knoxville apartment on Daylily Drive with K.H. and the Defendant. At that time, she considered the Defendant to be a father figure and called him "dad." Starting when the victim was seven years old, the Defendant started engaging in some behaviors with the victim that she did not like.

The first incident the victim recalled occurred in the afternoon when the Defendant "made [her] put [her] mouth on his no-no square" in his bedroom. According to the victim, K.H. was out of the house doing laundry at the time. The victim described that she was sitting on the foot of the bed and that the Defendant was "standing up right in front of [her]." When the Defendant exposed his penis to her, she began to cry. The Defendant moved his penis around in her mouth, which made the victim uncomfortable and caused her to have trouble breathing. The victim recalled that "[t]his white kind of goop came out" of the Defendant's "no-no square" and went in her mouth. She responded by spitting up on the Defendant, and he then went to clean himself in the bathroom." The victim affirmed that she felt "terrified."

The victim explained that by "no-no square," she was referring to the Defendant's "private part." The victim was then asked if she recalled going and speaking with someone at Childhelp, to which she responded affirmatively. The victim was shown a "picture that [she] drew when [she] described his no-no square," and after she affirmed that she recognized the drawing, it was admitted into evidence. The drawing was representative of a penis. When she was asked to describe the Defendant's "no-no square," the victim said that she did not feel comfortable talking about it. The prosecutor stated to the victim that she understood why she might be uncomfortable but asked the victim if she remembered how she "described it when [she] had been talked to before?" The victim said that she did not recall this prior conversation.

On another occasion, when the victim was eight years old, the Defendant came into the victim's bedroom at night, wearing boxers and smoking his pipe. The Defendant started smoking his pipe in her room and forced her to watch pornographic videos, which were "completely disgusting[,]" on his phone. The victim described that on these videos, she saw acts that were similar to the acts the Defendant was doing to her. The victim said that the videos showed the "no-no squares" of children and adults, explaining that some of the videos involved just adults and that others involved both children and adults.

The victim described a different occasion when she was taking a shower one morning. According to the victim, on this occasion, the Defendant took off his clothes and got in the shower with the victim, and he washed himself in front of her. The victim was presented with an anatomically correct drawing of a minor female and was asked to circle

the place the Defendant touched her on this occasion; she identified her breasts. The victim affirmed that she did not need any help bathing at the age of eight.

The victim was then asked if she recalled any additional incidents of inappropriate touching by the Defendant. The victim first stated that she did not remember any. However, when the victim was then asked if she recalled "doing an interview" and if she talked "to them about touching a no-no square," the victim responded, "He made me touch his." Relative to this touching, the victim described that when she was eight years old, she was on the Defendant's bed in his bedroom and that he made her touch his penis. The victim said that on this occasion, "white stuff" came out of the Defendant's penis and went into her mouth and that she subsequently had to clean herself because the Defendant's semen got on her pants and hands. The victim identified the "no-no square" as a penis on an anatomically correct drawing of a male figure.

The victim affirmed that she never wanted the Defendant to touch her in any of these ways and that throughout the Defendant's sexual abuse, she told him "multiple times" to stop. According to the victim, one time, she attempted to stop the Defendant's sexual abuse by spitting on him, and the Defendant punished her by grounding her for three months, meaning that she could only come out of her room to eat, use the bathroom, and go to school.

The victim affirmed that she discussed the sexual abuse with people from "DCS" and Childhelp and that she was telling the truth at trial. She agreed that at one point, she had denied that the Defendant sexually abused her; however, she explained that she had recanted because she "was scared and didn't know what to do." She explained that the Defendant told her not to disclose the abuse to anyone, but "especially CPS," referencing Child Protective Services or DCS. The victim said that she had witnessed the Defendant's being violent towards others, so she was afraid of him and what he would do to her if she disclosed the sexual abuse.

On cross-examination, the victim confirmed that she had received therapy after she moved to Michigan to live with her grandparents. In addition, the victim confirmed that when she lived in Knoxville, she visited her grandparents in Michigan during summers. While there, the victim also stayed with her aunt, and the victim's aunt let the victim "play on her phone." Defense counsel indicated that "there [were] some notes in the file about [the victim] . . . kind of putting in some – [Googling] some sex words into [her] aunt's phone and looking at some videos up there," but the victim did not recall engaging in such behavior. However, the victim explained that if she did engage in such behavior, it was probably because she was curious after she overheard the Defendant use those words.

The victim recalled that she had several girlfriends while she lived in Knoxville. One of those girlfriends had been placed in a foster home and her mother was in jail;

however, the victim was not sure if that friend's placement in the foster home was related to any sexual abuse. According to the victim, she and her girlfriend never discussed any "sexual stuff" related to those events, but the victim did recall telling one of her girlfriends about the things the Defendant was doing to her. Defense counsel also asked the victim whether she had a tablet while in school in Knoxville, noting that "the DCS notes say that [she] told them [she] found some stuff on a tablet, sex stuff"; however, the victim did not remember making any such statement.

Next, defense counsel mentioned that the victim had been interviewed by Childhelp several times and that though he had never met the victim, he had seen her before on a video recording from Childhelp. The victim said that she "sort of" remembered the interviews. Defense counsel then asked the victim about a statement she made during one interview, the victim's telling Childhelp that she "had alien blood that allowed [her] to see things that others couldn't." The victim explained that while she was awake, she saw "like, black figures or a different color, and sometimes they were, like, kind of death kind of things[.]" The victim affirmed defense counsel's characterization of these as "visions" and said they happened "pretty daily." She did not "really know" what alien blood meant, having learned the term from her mother. In addition, the victim said that she had a vision of the Defendant even before she knew him after her mother had described him and said he lived in Colorado; in her vision of the Defendant, she was "imagining him in a black coat with a hood on and looking down at the ground, with black boots, walking down the street at nighttime when it was really snowing." She said that she could "hear things" in the background of the vision, including "cop sirens," but she was not scared of the Defendant in the vision.

Defense counsel returned to questioning about the Childhelp recording and characterized the victim as "a pretty good singer." The victim remembered singing in the interview room after "that nice, blonde lady, Kelly, walked out of the room for a few minutes[.]" The victim "sort of" recalled going up to the "hidden camera" that was in the room. The victim affirmed that she was "pretty comfortable" and "felt safe" in that room, especially because she had been there "about three times." In addition, the victim confirmed that she and Kelly discussed the Defendant's daughter in Colorado, including their talking about the Defendant's daughter's allegations of sexual abuse and the Defendant's daughter's telling the victim "it happened tons of times." The victim explained that she had talked on the phone with the Defendant's daughter "about three times," that they got along pretty well, and that the Defendant's daughter had told her details about the sexual abuse. The victim affirmed that K.H. and the Defendant were worried about the Defendant's daughter and that they spoke about the Defendant's daughter often. The victim said that she was "[p]retty happy" at the time about the prospect of getting to meet the Defendant's daughter.

- 6 -

Defense counsel asked about the victim's last day at Montgomery Village, which the victim said she "sort of" remembered. She said that she had been picked up in a van from school, by what defense counsel described as "some DCS people," and that she was then taken to her first of several foster homes. The victim acknowledged that before she left for school that morning, the Defendant had yelled at her multiple times possibly for something she had done to the dog. Defense counsel asked if the Defendant yelled "something mean," to which the victim replied, "Yeah. I guess so, yeah," and she agreed that this was the same day she had gone to school and told a teacher that the Defendant was sexually abusing her.

On redirect examination, the victim said that the Defendant yelled at her almost daily. The State then asked the victim if she went to school and reported that the Defendant was sexually abusing her "almost daily," to which the victim responded affirmatively. The victim further affirmed that the abuse "really happened" and that she did not make these allegations because she was mad at the Defendant. She indicated that she was scared of Defendant both then and at the time of trial.

Following the victim's testimony, the State read and introduced into evidence a stipulation of the parties. The stipulation was as follows:

1. In May 2017[, the victim] was interviewed regarding allegations of sexual abuse by [the Defendant]. That investigation was closed after [the victim] stated that [the Defendant] did not sexually abuse her, but she said he did because she was mad at him for not letting her dress the way she wanted. [The victim] also reported that [the Defendant] and [K.H.] have told her not to talk to DCS because they will take her away.

2. In November 2017[, the victim] was interviewed regarding allegations of sexual abuse by [the Defendant]. That investigation was closed after [the victim] denied that [the Defendant] had touched her sexually.

3. In February 2018[, the victim] was interviewed regarding allegations of sexual abuse by [the Defendant]. [The victim] reported that [the Defendant] and [K.H.] instructed her that DCS was not her friend, and if her parents knew that she has spoken with DCS, then she will be in trouble at home.

Included in the stipulation was a limiting instruction that these prior statements could not be considered by the jury for the truth of the matter asserted therein but could be considered in assessing the credibility of the witness.

Investigator Jonathan Harris of the Knoxville Police Department ("KPD") received a referral from DCS in January 2018 regarding the victim's disclosure of abuse. Investigator Harris confirmed that shortly thereafter, Childhelp interviewed the victim regarding these allegations, that he was able to observe that interview, and that the victim disclosed during the interview that the Defendant sexually abused her. Investigator Harris then interviewed K.H. and the Defendant in order to investigate "the graphic sexual allegations that [the victim had] talked about during the interview."

The Defendant's interview was recorded, and the jury viewed the recording. After waiving his Miranda rights, the Defendant denied raping or abusing the victim. At the beginning of the interview, the Defendant explained that he had anxiety, depression, and PTSD documented in mental health paperwork he had brought with him to the interview. Though the Defendant said that he could only read or write "very little," he also indicated that he went to college for a time when he lived in Nebraska. In addition, during the interview, the Defendant and Investigator Harris discussed the Defendant's past trauma and his experiencing sexual abuse.

According to the Defendant, he and K.H. had been romantically involved for about four years, and they were engaged at the time of the interview. The Defendant described that after K.H. and the victim moved to Knoxville, he acted as the victim's father, and the victim was very attached to him. He also said that they all got along well, although, like other kids, the victim had "her nuclear meltdowns."

The Defendant informed Investigator Harris that he had two biological children—a son who was given up for adoption and a daughter who had lived with her mother but was "taken by the State of Colorado" about two years prior after she was raped by her step-brother and her mother's boyfriends. Relative to K.H.'s reading the court documents regarding his daughter to him, the Defendant indicated that K.H. tried to read them privately, but that the victim would eavesdrop on their conversations.

The Defendant explained that he found out about the current allegations of sexual abuse when the victim did not get off the school bus one day, and they did not know where she was and could not locate her. According to the Defendant, it was not until later that night that DCS contacted them and informed them an investigation was underway regarding "environmental neglect" because the house was dirty.

The Defendant indicated that the victim had accused him of such behavior before, but that after an investigation, those allegations were found to be unsubstantiated with "no proof." Investigator Harris explained that they had received another DCS referral with the same allegations of the Defendant's "doing sexual things with" the victim. Investigator Harris said that the victim was "very descriptive" in the most recent forensic interview regarding what took place between the two of them. The Defendant indicated that he did

not know how the victim learned about the graphic things she said in the interview, but the Defendant said that while they were living in Michigan, the same issue came up with the victim's grandfather. According to the Defendant, while he lived in Michigan with the family, the victim was taken to the hospital because she said her grandfather had touched her, but that after a forensic interview, nothing came of it. The Defendant further indicated that every time the victim returned from her summer visits in Michigan, she was "completely buck-f--king-wild" after hanging "out with teenagers in this trailer park and watch[ing] porn." When asked why he thought the victim made up the current sexual allegations against him, he said that it was because he told her he was not moving back to Michigan.

After the recorded interview was played for the jury, Investigator Harris explained that he was unable to recover any forensic evidence of the Defendant's criminal conduct because of the delay in time between the events and the victim's disclosure. He explained that there was a "short window" when forensic evidence could be collected, usually about seventy-two hours. The State asked if this was the kind of case that did not need an immediate response because the referral was about "environmental neglect and not a sex abuse" allegation. Investigator Harris did not "recall the exact verbiage of the referral" but there was "stuff too" relating to a neglectful home environment; those types of allegations did not involve looking for items to test for DNA.

That concluded the State's proof, and the Defendant presented testimony from Leslie Brown, who lived next door to the family when they lived in Montgomery Village. Ms. Brown said she was especially familiar with the Defendant, describing him as "very helpful." According to Ms. Brown, the Defendant did things for her like take out her garbage and bring in her groceries, so they became "pretty friendly." Although the victim was "quite a bit older" than Ms. Brown's son, the two still played together sometimes.

Ms. Brown stated that one day, the victim came home from school in a different outfit from the clothing that she had worn when she left home and that the victim "had gotten in trouble" because the second outfit had "super short shorts[.]" Sometime after this incident, Ms. Brown said that K.H. approached her concerned because the victim was not at school and had told someone at school that the Defendant had "done some stuff to her" and that the Defendant "was not allowed to be around her until CPS settled their case." The victim stayed with Ms. Brown during the pendency of the DCS investigation, about three days, during which time Ms. Brown discussed the sexual abuse allegations with the victim. Ms. Brown asserted that she "didn't want to pressure" the victim, telling the victim to "scream it from the rooftop" if it was true, but if it was not true, then it was "a horrible thing to put on someone's name." According to Ms. Brown, the victim started crying and told Ms. Brown that she made up the allegations because she "was mad at [the Defendant]

for not letting her dress the way she want[ed] to." Ms. Brown thought "that was kind of the end of it," and she "figured CPS would do their thing and the truth would come out."

On cross-examination, Ms. Brown stated that although she believed that K.H. and the Defendant were likely abusing drugs, she was not certain of that fact because she "had also been told before that [the victim] had made up different things." Ms. Brown affirmed that she never reported the drug usage to DCS. Further, she admitted that she was aware of the domestic violence between the Defendant and K.H. and that she would not be surprised if the victim witnessed such incidents. Ms. Brown opined that the victim's fear of the Defendant was reasonable.

In rebuttal, the State called the victim's grandmother, who lived in Michigan. The victim's grandmother confirmed that the victim would visit every summer when she lived in Knoxville. During these visits, the victim was a "[n]ormal kid, kind of rowdy sometimes, very inquisitive and curious, fairly upbeat, [and] loving child." However, the victim's grandmother also noticed that during these visits, the victim was "fidgety" and would, at times, react with more emotion than she expected. She said the victim "absolutely" did not spend time with teenagers in the area; she affirmed that she would never describe the victim's temperament during these visits as "buck-wild, running with the teenagers."

The victim's grandmother then recalled an investigation that occurred involving sexual abuse of the victim by her grandfather. The victim's grandmother explained that the victim had complained "of a rash in her netherlands [sic], her privates," and that she took the victim to the doctor where the victim received ointment for the rash due to her "privates [being] very inflamed and very red." The victim's grandmother said that CPS contacted them after the doctor's visit to question the family, suspecting that there might have been some kind of sexual abuse involved. The victim's grandmother testified that "when they questioned [the victim] about touching and stuff, [the victim] denied that [anyone in the family] had touched her" in an inappropriate way and that the victim was even confused by what the investigators meant by "touching."

According to the victim's grandmother, CPS "required" that the victim be taken to a forensic doctor to be examined. Once examined, the doctor said that the victim had not been "sexually molested" but instead had a condition called "pediatric lichen sclerosis" and that some hygiene habits would have to be changed to correct the situation. The victim's grandmother testified that "the case was closed" after this point, and she explained that the reason they had suspected her husband of sexually abusing the victim was "[b]ecause he was the only male living in the house." The victim's grandmother indicated that the Defendant was not "in the picture" yet when this happened. Moreover, the victim's grandmother said that they would not have been able to later get custody of the victim had "they suspected or thought that there was any degree of truth to anything."

- 10 -

Following closing arguments and deliberations, the jury found the Defendant guilty as charged. After a sentencing hearing on January 9, 2020, the trial court sentenced the Defendant to a total effective sentence of forty-two years, to be served at 100%.[2]

The Defendant filed a timely motion for new trial, which was later amended. In the amended motion, the Defendant argued that the trial court committed plain error in admitting the victim's testimony relative to details of her Childhelp forensic interview, including allusions to the content of that statement and introduction of diagrams made; in admitting evidence that the victim reported the alleged sexual abuse to school officials; and in admitting evidence through Investigator Harris that the victim gave a forensic interview and that she disclosed she had been sexually abused in that interview. The Defendant also contended that the State made improper closing arguments by vouching for the victim's credibility and injecting the prosecutor's personal opinions, by diminishing the burden of proof beyond a reasonable doubt, and by disparaging the defense strategy. In addition, the Defendant asserted that the cumulative effect of these errors warranted a new trial.

The trial court denied the Defendant's motion for new trial after a hearing. The trial court made oral findings from the bench regarding the issues specifically argued at the hearing, as well as stating that it had also reviewed the Defendant's written arguments and that they did not entitle him to relief. After the trial court's filing of a written order denying the motion for new trial, the Defendant filed a timely notice of appeal.

## ANALYSIS

On appeal, the Defendant argues that (1) the trial court committed plain error by allowing trial references to the victim's forensic interview, as well as permitting remarks that the victim made allegations against the Defendant while at school; (2) the trial court committed reversible error by letting the State make improper comments during closing argument; and (3) the cumulative effect of these errors deprived him of a fair trial. We will address each in turn.

### A. References to the Victim's Prior Disclosures

The Defendant submits that the trial court committed plain error in allowing repeated hearsay references to the victim's prior out-of-court allegations against the Defendant, specifically references to the victim's Childhelp forensic interview (both by the victim and Investigator Harris) and the victim's reports to school officials. The Defendant first cites to State v. Livingston, 907 S.W.2d 392, 395 (Tenn. 1995), for the proposition that there is no "fresh complaint" hearsay exception in child sexual abuse cases and that,

---

[2] However, we note that there is a clerical error in the judgment form for Count 3. Though a twelve-year sentence was imposed, there is no sentence entered on the judgment form.

therefore, this evidence was not admissible. According to the Defendant, "the State's entire presentation of [the victim's] testimony was largely structured around, not her contemporary testimony, but her prior statement to Childhelp."

The Defendant further submits that evidence regarding the victim's prior disclosures was not admissible because such disclosures did not serve to rehabilitate the victim. According to the Defendant, because the credibility of the victim was not seriously attacked at the time of her direct examination, the previous disclosures were not admissible. The Defendant continues that even after cross-examination of the victim, the prior disclosures were not admissible as prior consistent statements because defense counsel did not suggest that the victim's allegations were the result of recent fabrication or deliberate falsehood. The Defendant concludes that these errors served only to bolster the victim's testimony and influence the jury to decide the case on this repetitive testimony. The Defendant also notes that the State made repeated references to this evidence during closing argument as a specific reason to accredit the victim's testimony.

The Defendant concedes that this issue is reviewable only for plain error due to his failure to raise any contemporaneous trial objections. Generally, a defendant's failure to make a contemporaneous objection results in waiver of the issue on appeal. See Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Accordingly, these issues are only reviewable for plain error. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.").

The doctrine of plain error applies when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)).

The State responds that the Defendant is not entitled to plain error relief because he waived the issues for tactical reasons, noting that the Defendant agreed to stipulate that the victim had made previous disclosures and had recanted those disclosures. The State asserts that the stipulation benefitted the Defendant because it supported an inference that the victim's allegations of current sexual abuse were false and damaged her credibility. In addition, the State noted that it was defense counsel who questioned the victim extensively about her forensic interview, not the State during the victim's direct examination. Next, the State contends that admission of references to the victim's prior disclosures did not breach a clear and unequivocal rule of law because the State's questions referencing the Childhelp interview laid the foundation for introduction of an exhibit or were the beginning of attempts to refresh the victim's memory. The State then submits that the references did not adversely affect the Defendant's right to cross-examine the State's witnesses, noting that defense counsel thoroughly cross-examined the victim about her allegations of sexual abuse. Finally, the State argues that consideration of this issue is not necessary to do substantial justice because the references were brief and the State's evidence was strong.

The Defendant responds that the fact that the victim had previously made an allegation against the Defendant, both during the forensic interview and later at school, was introduced into evidence as a reason to conclude that the Defendant was guilty and was also used in closing argument by the prosecutor as a reason to conclude that the Defendant was guilty. According to the Defendant, this was a violation of Livingston, distorting the entire form of the trial, and was plain error requiring a new trial.

It is true that ordinarily prior consistent statements of a witness are not admissible to bolster a witness's credibility. State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980).[3] However, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Before prior consistent statements may be admissible, a witness's testimony must have been assailed or attacked to the extent that the witness's testimony needs rehabilitating. Id. at 434.

In the matter sub judice, at the motion for new trial hearing, the trial court specifically addressed the Defendant's allegation relative to the victim's references to her forensic interview and found as follows:

> That was a matter that was used quite a bit by the defense, exactly what she said. The child not only made some recantations, but also made some rather bizarre statements in at least one of those videos to DCS. And so I think it

---

[3] We feel constrained to note that it does not appear the State ever sought to have the forensic interview admitted as substantive evidence pursuant to Tennessee Code Annotated section 24-7-123.

- 13 -

was used fairly effectively by the defense. . . . And the defense knew that they were going to use those videos against the State. And so there was no point, I think, from their perspective, on objecting to it.

Thus, the trial court concluded that any references to the victim's prior statement were not plain error.

We agree with the trial court and the State that the Defendant is not entitled to plain error relief because he waived the issues for tactical reasons. The Defendant agreed to stipulate that the victim had made previous disclosures and had recanted those disclosures, and the stipulation benefitted the Defendant because it supported an inference that the victim's current allegations of sexual abuse were false and damaged her credibility. The defense used those prior statements "effectively" against the State.

Beginning with defense counsel's cross-examination of K.H., it was insinuated how the victim gained knowledge of sexual things, as well as establishing the victim's motivation to lie. K.H. was asked about allegations of sexual abuse by the victim's friends in the neighborhood and about information related to the Defendant's daughter's allegations of sexual abuse in Colorado. K.H. also testified that she took the victim, who was about five years old, to the hospital in Michigan based upon an allegation of sexual abuse that did not involve the Defendant. K.H. confirmed that though the victim was questioned by a Michigan agency "similar to Childhelp in Tennessee," nothing came of those allegations. Moreover, it was defense counsel who first mentioned during the cross-examination of K.H. that there were "some of the notes from" DCS mentioning issues of environmental neglect.

The victim was simply asked on direct examination if she recalled going and speaking with someone at Childhelp before being shown a "picture that [she] drew when [she] described his no-no square[.]" The victim affirmed that she had spoken with someone at Childhelp and that she recognized the drawing, which was admitted into evidence. The drawing was representative of a penis. When she was asked to describe the Defendant's "no-no square," the victim said that she did not feel comfortable talking about it. The prosecutor stated to the victim that she understood why she might be uncomfortable but asked the victim if she remembered how she "described it when [she] had been talked to before?" The victim did not recall this prior conversation and that ended this line of questioning.

Later, during her direct testimony, the victim was asked if she recalled any additional incidents of inappropriate touching by the Defendant. After she first stated that she did not remember any additional incidents, the State asked the victim if she recalled "doing an interview" and if she talked "to them about touching a no-no square," to which she responded, "He made me touch his." These references to the victim's prior disclosures

- 14 -

were made in an attempt by the State to lay the foundation for introduction of an exhibit or were the beginning of attempts to refresh the victim's memory.

The victim also affirmed that she discussed the sexual abuse with people from "DCS" and Childhelp and that she was telling the truth at trial. She agreed that at one point, she denied that the Defendant sexually abused her; however, she explained that she recanted because she "was scared and didn't know what to do." She explained that the Defendant told her not to disclose the abuse to anyone, but "especially CPS," referencing Child Protective Services or DCS. Here, the State was attempting to ask the victim to explain her prior disclosures and recantations, which would be introduced through the agreed stipulation.

We further agree that it was defense counsel who questioned the victim extensively about her prior disclosures and forensic interview. Defense counsel asked the victim about her girlfriends while she lived in Knoxville. The victim testified that she did not discuss any "sexual stuff" related to any events involving her friend, but the victim did recall telling one of her girlfriends about the things the Defendant was doing to her. The victim also was asked about "some notes in the file about [her] . . . kind of putting in some – [Googling] some sex words into [her] aunt's phone and looking at some videos up there" in Michigan and whether the victim had a tablet while in school in Knoxville, noting that "the DCS notes say that [she] told them [she] found some stuff on a tablet, sex stuff." However, the victim did not remember engaging in such behavior or making any such statement.

Defense counsel then inquired about the victim's various interviews with DCS and Childhelp. He mentioned that though he had never met the victim before trial, that he had seen her on a video recording of her forensic interview. Defense counsel asked the victim about her statement made during the interview that she "had alien blood that allowed [her] to see things that others couldn't." The victim explained that her mother had used such a term and that while she was awake, she had visions. Defense counsel also affirmed that after watching the recording, he observed that the victim was "a pretty good singer," and the victim "sort of" recalled going up to the "hidden camera" that was in the room. The victim affirmed that she was "pretty comfortable" and "felt safe" in that room, especially because she had been there "about three times." In addition, the victim confirmed that they talked about the Defendant's daughter's allegations of sexual abuse and the Defendant's daughter's telling the victim "it happened tons of times."

Defense counsel also asked the victim about her motivations to lie, specifically her last day at Montgomery Village. The victim said that she had been picked up in a van from school with what defense counsel described as "some DCS people" and that she was then taken to her first of several foster homes. The victim acknowledged that before she left for school that morning, the Defendant had yelled at her multiple times, and she agreed that this was the day she had gone to school and told a teacher that the Defendant was sexually

abusing her. However, it was not until redirect examination of the victim that the State asked the victim if she went to school and reported that the Defendant was sexually abusing her "almost daily," to which the victim responded affirmatively. The victim further affirmed that the abuse "really happened" and that she did not make these allegations because she was mad at the Defendant. She indicated that she was scared of Defendant both then and at the time of trial.

Moreover, the State questioned Investigator Harris about the victim's forensic interview in an attempt to establish why and how Investigator Harris continued with his investigation. Investigator Harris's recorded interview with the Defendant was played for the jury. During the interview, the Defendant mentioned his daughter's allegations in Colorado as a reason that the victim might have inappropriate knowledge of sexual things. The Defendant also indicated that the victim had accused him of such behavior before, but that after an investigation, those allegations were found to be unsubstantiated with "no proof." Investigator Harris explained they had received another DCS referral with the same allegations of the Defendant "doing sexual things with" the victim and that the victim had been "very descriptive." Though the Defendant did not know how the victim learned about the graphic things she said in the interview, he mentioned that while they were living in Michigan, the victim was taken to the hospital because she said her grandfather had touched her, but that after a forensic interview, nothing came of the allegations. The Defendant further indicated that every time the victim returned from summer visits in Michigan, she was "completely buck-f--king-wild" after hanging "out with teenagers in this trailer park and watch[ing] porn." When asked why he thought the victim made up the current sexual allegations against him, he said that it was because he told her he was not moving back to Michigan. Again, the Defendant, through his own words, was attacking the victim's credibility and insinuating the victim deliberately fabricated these allegations. We cannot say that any clear and unequivocal rule of law has been breached.

Moreover, the evidence, even if prematurely done so, would have ultimately been admissible once the Defendant suggested that the victim's allegations were the result of recent fabrication or deliberate falsehood. See State v. Fredrick Arnaz Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at *11 (Tenn. Crim. App. Sept. 14, 2006). In addition, the record shows that the trial court instructed the jury on prior consistent statements of witnesses following the stipulation and in the closing jury instructions. See Livingston, 907 S.W.2d at 398. Consideration of this issue is not necessary to do substantial justice nor has a substantial right of the Defendant's been adversely affected because the references to the out-of-court statements were brief and the State's evidence was relatively strong. The Defendant has failed to establish his entitlement to plain error relief.

*B. Closing Arguments*

Next, the Defendant argues that the State committed prosecutorial misconduct during closing argument by improperly vouching for the victim, denigrating the defense, and diminishing the burden of proof. The State contends that this issue is waived because Defendant failed to object contemporaneously at trial. The Defendant counters that, although he did not make a contemporaneous objection, he is entitled to plenary review under State v. Hawkins, 519 S.W.3d 1, 48 (Tenn. 2017), because he raised the issue in the motion for a new trial.

The majority of cases in this State have held that the failure to lodge a contemporaneous objection during closing argument waives the issue on appeal. See State v. Jordan, 325 S.W.3d 1, 58 (Tenn. 2010); State v. Banks, 271 S.W.3d 90, 132 n.30 (Tenn. 2008); State v. Reid, 164 S.W.3d 286, 344 n.3 (Tenn. 2005) (appendix); State v. Reid, 91 S.W.3d 247, 284 (Tenn. 2002); State v. Larkin, 443 S.W.3d 751, 813 (Tenn. Crim. App. 2013); see also United States v. Young, 470 U.S. 1, 13 (1985) (the United States Supreme Court applying plain error review to improper closing argument claims where neither party made a timely objection to preserve the issue for review). However, in Hawkins, a death penalty case, the defendant raised four instances of alleged misconduct in closing statements, none of which drew a contemporaneous objection and only two of which were raised in the motion for new trial. 519 S.W.3d at 48. The Tennessee Supreme Court applied plenary review to the two issues raised in the motion for a new trial, one of which had been the subject of a previous motion in limine. Id. One of the prosecutor's statements which received plenary review violated the trial court's pretrial ruling that the prosecutor should not use the term "rape" when referring to an offense not charged in the case. Id.; see also State v. Zackary James Earl Ponder, No. M2018-00998-CCA-R3-CD, 2019 WL 3944008, at *11 (Tenn. Crim. App. Aug. 21, 2019) (applying plenary review to a statement in a closing argument that violated a pretrial ruling but was not objected to at the time it was made).

The issue of whether a defendant is entitled to plenary or only plain error review of improper argument which was not objected to but was preserved in a motion for new trial is an issue currently before the Tennessee Supreme Court. See State v. Tyler Ward Enix, No. E2020-00231-CCA-R3-CD, 2021 WL 2138928, at *15 (Tenn. Crim. App. May 26, 2021), perm. app. granted (Tenn. Oct. 13, 2021). Regardless of whether we apply plain error or plenary review, the Defendant is not entitled to relief.[4] See State v. Charvaris Donte Newsom, No. M2020-00681-CCA-R3-CD, 2021 WL 1753409, at *19 (Tenn. Crim. App. May 4, 2021), perm. app. denied (Tenn. Sept. 22, 2021); State v. Martell Smith, No.

---

[4] We will engage in plenary review because it is the less onerous standard for the Defendant to meet and neither standard entitles the Defendant to relief. By doing so, we did not intend to imply that plenary review is the proper standard.

M2019-01575-CCA-R3-CD, 2020 WL 6603467, at *7 (Tenn. Crim. App. Nov. 12, 2020), perm. app. denied (Tenn. Mar. 17, 2021) (both cases concluding that the defendant was not entitled to relief regardless of whether plain error or plenary review was applied to the statements from closing argument).

Our supreme court has summarized prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. [Banks, 271 S.W.3d at 130]. While "argument of counsel is a valuable privilege that should not be unduly restricted," Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975), "such . . . arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); see also State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 David L. Raybin, Tennessee Practice: Criminal Practice and Procedure § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. Banks, 271 S.W.3d at 131; State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." Banks, 271 S.W.3d at 131.

State v. Sexton, 368 S.W.3d 371, 418-19 (Tenn. 2012). Although not exhaustive, this court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. Goltz, 111 S.W.3d at 6.

In addition, our supreme court has advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. Banks, 271 S.W.3d at 131 (citing Young, 470 U.S. 1, 11-13 (1985); State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. (citing State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998)); see also Reid, 164

- 18 -

S.W.3d at 321. To evaluate the prejudicial impact of an improper prosecutorial argument, the following factors should be considered: (1) the conduct at issue in light of the facts and circumstances of the case; (2) any curative measures taken by the trial court and the State; (3) the prosecutor's intent in making the improper argument; (4) the cumulative effect of the improper argument; and (5) the relative strengths and weaknesses of the case. State v. Buck, 670 S.W.2d 600, 609 (Tenn.1984) (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see also Goltz, 111 S.W.3d at 5-6. Courts also "take[] into account whether the improper remark of the prosecutor was made in response to the defendant's comments or argument." Judge, 539 S.W.2d at 344; see also Tenn. R. Crim. P. 29.1(c)(2) ("The [S]tate's final closing argument is limited to the subject matter covered in the [S]tate's first closing argument and the defendant's intervening argument.").

During initial closing argument, the prosecutor noted that the jury would hear a lot from both sides "about credibility in this case" and that the jury members were the judges of witness credibility. The prosecutor indicated that the jury should analyze the body language and recollection of the various witnesses, as well as the witnesses' motivations to lie, in assessing their credibility. She then said, "The State believes you will believe [that the victim] was telling the truth each and every time she told an adult, crying for help, that [the Defendant] was molesting her." The prosecutor averred that the jury did not have to rely on the victim's testimony alone, noting that these allegations had been investigated "[a]gain and again" and that "where there's smoke, there's fire[.]" The prosecutor then outlined how the victim's testimony was corroborated by the testimony of the other witnesses, as well as why the Defendant's statements during the interview were "just nonsense." Later, the prosecutor surmised, "[F]or two years, whatever else has been happening, [the victim] comes back to that story . . . [b]ecause it really happened, because [the Defendant] did those things to [her]."

During the defense's closing argument, defense counsel speculated that the victim learned about sexual abuse from speaking with the Defendant's daughter, who had also been sexually abused. Defense counsel attacked the victim's credibility, arguing that the "entirety of" the State's evidence was "just some words from the mind of a child," who had "been seeped in this stuff for years now." Defense counsel asserted that the victim had talked about sexual abuse "God knows how many times," noting that the victim had discussed it with social workers and therapists, as well as in multiple forensic interviews, most of which allegations were found to be unsubstantiated.

Defense counsel then discussed how a child's minds works and said that though it was "wrong to call a little kid a liar," the victim was "not a reliable historian" relative to this case; he submitted that the information contained in the stipulation was proof of that fact. Defense counsel asserted that details were easy to fabricate and that the victim's allegations were "pretty generic." Defense counsel observed that while the victim's

testimony "was moving," it was "plausible that she was stressed because what she had said a couple years ago wasn't true, and she's in too deep to get out[.]" Defense counsel averred that it was also "plausible, at this stage in the game, [the victim did not] even know what the truth was anymore." Defense counsel surmised that while that victim was sympathetic, the jury had a duty to uphold the law and find that the State had not proven its case beyond a reasonable doubt.

During the State's rebuttal argument, the prosecutor responded to defense counsel's argument: "We do know what the truth is because [the victim] told us the truth, and she has been telling the truth despite adults in her life who failed her again and again." The prosecutor argued that it was unlikely the victim was testifying to gain attention, noting that the victim appeared to be uncomfortable while testifying. The prosecutor argued, "But [the victim] still says that it is the truth, and [the Defendant] did those things to her. For two years[,] she's been telling that story because it's the truth. . . . This child told you a horrible, terrifying tale for two years because it happened to her." The prosecutor continued to argue that the victim was a credible witness, noting that the victim cried when describing the abuse and that she corrected the lawyers when they "asked questions or had something wrong."

Additionally, the prosecutor again submitted that the Defendant was not credible during his interview with Investigator Harris. After reciting specific statements from the Defendant during his interview and positing that they were untrue, the prosecutor commented, "What we have on the entire defense is throw everything at the wall and see if any of it sticks." The prosecutor argued that the victim could be angry about not getting to wear the clothes she wanted to and still be telling the truth about the sexual abuse. Also, the prosecutor cited to Ms. Brown's testimony about the Defendant's drug usage, as well as Ms. Brown's acknowledgement that the victim's fear of the Defendant was reasonable. The prosecuoter remarked, "To believe the [d]efense theories, we've got to believe that she's attention seeking. We know that's not true. We've seen that. We've seen her reaction. We've got to believe that she's just repeating what other people have said. We know that's not true." The prosecutor concluded that the victim was "telling the truth when she [said], [']He did those things to me.[']" The prosecutor asked the jury to find the Defendant guilty, asserting that State had proven the allegations beyond a reasonable doubt.

1. <u>Improper Vouching</u>. First, the Defendant submits that the State gave its own assessment on the veracity of the victim's testimony throughout its closing argument, citing to the following statements: "The State believes . . . ."; "We do know what the truth is because [the victim] told us the truth[.]"; "For two years[,] she's been telling that story because it's the truth."; "We know that's not true. We've seen that. We've seen her reaction [. . . .] We know that's not true."; and "But she's telling the truth when she says,

'He did those things to me.'" According to the Defendant, "these arguments could have encouraged the jury to believe that the prosecutor knew more than the jury did about the allegations, and it was on the basis of that additional knowledge that the prosecutor's certainty rested." The State responds that the prosecutor did not improperly vouch for the victim's credibility, contending, "[I]t is clear that the State was arguing that the victim was credible and explaining why the jury should accredit her testimony, not 'vouching' for the victim based on personal knowledge of her or personal belief in her testimony."

Certainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness or as to the accused's guilt or innocence. State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (citing State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989)). Although a prosecutor is prohibited from expressing a personal opinion on a witness's credibility, he or she may argue based upon an analysis of the evidence and the conclusion supported by the evidence. See Tenn. Sup. Ct. R. 8, RPC 3.4(e)(3); see also 75A Am. Jur. 2d Trial § 692 (1991) ("The credibility of a witness is a proper subject for closing argument, but as a matter of professional ethics a lawyer may not state a personal opinion as to the credibility of a witness.") & § 699 ("The general rule . . . is that it is improper for an attorney to vouch for or assert his personal opinion as to the credibility of a witness since it is not proper for counsel to take the position of an unsworn witness as to credibility."). This issue of "[w]hether a statement qualifies as misconduct often depends upon the specific terminology used." Thornton, 10 S.W.3d at 235 (citing United States v. Stulga, 584 F.2d 142, 147 (6th Cir. 1978) (stating that "[t]he use of the words 'submit' are not the equivalent of expressing an opinion")).

At the motion for new trial hearing, the trial court concluded that the State did not vouch for the victim during closing argument, reasoning, "I think that most of the ones where the State was talking about the truthfulness of the child, they were talking about specific things that support that truthfulness, rather than their opinion. So I think those arguments were okay." However, contrary to the trial court's ruling, we are constrained to agree with the Defendant that several times the prosecutor made an unequivocal assertion that the victim was telling the truth and the comments were, therefore, improper. See, e.g., State v. Madaryl Dewayne Hampton, No. W2019-01551-CCA-R3-CD, 2021 WL 2917309, at *6 (Tenn. Crim. App. July 12, 2021), perm. app. denied (Tenn. Oct. 15, 2021); State v. Damarkus Lowe, No. E2017-00435-CCA-R3-CD, at *25 (Tenn. Crim. App. July 6, 2018) (both cases finding similar comments to be improper vouching). Accordingly, we must assess the prejudicial impact of the prosecutorial argument using the factors outlined in Judge.

When the prosecutor's comments are viewed in light of the surrounding argument, the prosecutor was observing that this case hinged on the victim's credibility and that the jury should believe the victim based upon the evidence and testimony at trial; the

prosecutor was not inferring, as the Defendant suggests, that she knew more than the jury did about allegations. The victim's credibility was vigorously attacked by the defense, and the prosecutor's comments were an attempt to address the discrepancies pointed out by the defense. Relative to the strength of the State's case, the victim's credibility was largely supported by testimony from the other witnesses, and the Defendant's recorded interview was certainly riddled with inaccuracies. Also, during the State's closing argument, the prosecutor indicated to the jury that they were judges of credibility. Furthermore, the trial court instructed the jury that "[s]tatements, arguments and remarks of the attorneys were intended to help in understanding the evidence and applying the law, but that they were not evidence." The trial court went on to instruct the jury as follows, "It is your job to decide what the facts of this case are. You must decide which witnesses you believe and how important you think their testimony is." We generally presume that the jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Accordingly, we hold that the prosecutor's improper statements vouching for the victim's credibility were harmless. See, e.g., State v. Morris Wayne Adcock, No. M2012-01631-CCA-R3-CD, 2013 WL 6187700, at *16-17 (Tenn. Cri., App. July 16, 2013) (finding improper vouching comments to be harmless error); see also Thornton, 10 S.W.3d at 235.

2. Burden of Proof. Next, the Defendant contends that the State's argument diminished the burden of proof when, in reference to the investigation that initiated this case, the prosecutor said that "where there's smoke, there's fire[.]" According to the Defendant, this statement encouraged the jury to find the Defendant guilty merely on the basis of suspicion rather than beyond a reasonable doubt. The State responds that the prosecutor did not improperly shift the burden of proof to the Defendant and that the prosecutor's comment was intended to explain why the victim was interviewed several times.

The prosecutor averred that the jury did not have to rely on the victim's testimony alone, noting that these allegations of sexual abuse against the victim had been investigated "[a]gain and again" and that "where there's smoke, there's fire[.]" The prosecutor was attempting to argue that because the victim had made similar allegations before, albeit later determined to be unfounded, she should be believed this time. The victim's prior allegations and recantations were matters included in the record. Relative to the burden of proof, both the prosecutor and defense counsel specifically referred to the beyond reasonable doubt standard in their respective closings. Importantly, the trial court instructed the jury on the State's burden of proof of beyond a reasonable doubt in a criminal case. Though these statements may have stretched the bounds of appropriate closing argument, they did not shift the burden of proof from the State to the Defendant. See, e.g., State v. Jose Dimas Alvarado, No. M2016-00378-CCA-R3-CD, 2017 WL 2791181, at *17 (Tenn. Crim. App. June 27, 2017).

- 22 -

3. Defense Theory. Finally, the Defendant asserts that the State denigrated the defense by saying "what we have on the entire defense is throw everything at the wall and see if any of it sticks." The State asserts that the comment did not denigrate the defense because, when viewed in the context of the State's entire rebuttal argument, "it is clear that the State argued that the defense theory of the case . . . was consistent with [the victim's] disclosure of abuse."

Here, at the motion for new trial hearing, the trial court noted that the State's comment about the defense strategy "might be objectionable" because it may have seemed as if the State was "attacking more the defense rather than the arguments of the defense in themselves." However, the trial court further determined that the comment did not rise to level of plain error.

It has long been recognized that the "prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citations omitted). Nonetheless, our supreme court has also found it permissible for the prosecutor to comment during closing argument on the strength and believability of the defense theories when the defendants had, through their own witnesses and through cross-examination, offered various explanations, implied and expressed, as to the State's proof. See State v. Hall, 976 S.W.2d 121, 157-58 (Tenn. 1998) (finding no abuse of discretion in the trial court's overruling the defendant's objections to the State's closing comments such as "'that's not a reasonable alternative,'" and "'such a ridiculous position'"). Moreover, this court has held that a prosecutor's comments during rebuttal closing argument reflecting unfavorably on defense counsel and the defense's trial tactics were not error when the comments were in response to statements made by defense counsel during closing arguments. See, e.g., State v. Brandon Robert Vandenburg, No. M2017-01882-CCA-R3-CD, 2019 WL 3720892, at *52-53 (Tenn. Crim. App. Aug. 8, 2019) (concluding that the prosecutor's comments during rebuttal argument addressing the defense's arguments as "red herrings" did not breach a clear and unequivocal rule of law to rise to the level of plain error when the comments were in response to defense counsel's statements during closing arguments); State v. Lance Burton, No. W2009-01875-CCA-R3-CD, 2010 WL 3244949, at *5 (Tenn. Crim. App. Aug. 17, 2010) (addressing the prosecutor's comments referencing the defense's arguments as "defense attorney tricks, defense attorney strategy").

The prosecutor made this statement during its rebuttal argument after reciting specific statements from the Defendant during his interview and positing that they were untrue. Following the statement, the prosecutor observed that the victim could be angry about not getting to wear the clothes she wanted to and still be telling the truth about the sexual abuse. The prosecutor further noted inconsistencies with Ms. Brown's testimony. Through his own witness, through cross-examination of the State's witnesses, and through

- 23 -

closing argument, the Defendant offered various explanations, implied and expressed, regarding the victim's underlying knowledge of matters of a sexual nature and her motivations to lie. The prosecutor was entitled to respond to defense counsel's arguments concerning the credibility of the victim and assert that the proof did not support these alternative explanations offered by the defense. See Hall, 976 S.W.2d at 158; see also Burton, 2010 WL 3244949, at *5; State v. J.C. Fair and Krederick Fair, No. W2007-00730-CCA-R3-CD, 2009 WL 2501991, at *16 (Tenn. Crim. App. Aug. 14, 2009).

Furthermore, this statement was relatively innocuous, and the trial court explained to the jury that the arguments of counsel were not evidence. Even if this comment were improper, it was harmless. See State v. Joshua Hunter Bargery, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *59 (Tenn. Crim. App. Oct. 6, 2017) (finding that when viewed in the context of the facts of the case, the improper conduct did not affect the verdict to the prejudice of the defendant).

## *C. Cumulative Effect*

Finally, the Defendant asserts that the trial court's cumulative errors warrant the reversal of his convictions. See State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) ("The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial."). We found no error with the Defendant's first issue relative to improper references to the victim's out-of-court statements. Relative to the Defendant's issue regarding improper closing arguments, for the reasons expressed above, we cannot say that inappropriate closing argument was so inflammatory or improper as to affect the verdict.

## CONCLUSION

In accordance with the foregoing, we affirm the judgments of the trial court. However, as noted in this opinion, we remand the case for entry of a corrected judgment form in Count 3 to reflect the imposition of a twelve-year sentence.

_____
D. KELLY THOMAS, JR., JUDGE